**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| NICHOLAS H., through his Parents | : |
| JEFFREY and DENISE H. of | : CIVIL ACTION |
| Jeffersonville, PA | : |
| | : |
| Plaintiffs | : NO. 16-CV-1154 |
| | : |
| vs. | : |
| | : |
| NORRISTOWN AREA SCHOOL DISTRICT | : |
| of Norristown, PA | : |
| | : |
| Defendant | : |

**MEMORANDUM AND ORDER**

JOYNER, J.                                          **February 10, 2017**

    This matter has been brought before the Court on cross-
motions of the parties for judgment based upon the administrative
record before the Hearing Officer.  For the reasons set forth
below, the motions shall be granted in part and denied in part.

**History of the Case**

    Nicholas H. is a 16-year-old high school sophomore who
resides with his parents in the Norristown Area School District.
Nicholas has been identified as a child with a disability within
the meaning of the Individuals with Disabilities Education Act
("IDEA"), 20 U.S.C. §1400, *et. seq.* and Section 504 of the

Rehabilitation Act of 1973, 29 U.S.C. §794.[1]  Specifically,
Nicholas has been diagnosed as having a variety of disabilities
and/or conditions which impair his ability to learn including:
Attention Deficit Hyperactivity Disorder, combined type ("ADHD"),
Generalized Anxiety Disorder, Developmental Coordination
Disorder, Dysgraphia (writing disorder), Developmental Arithmetic
Disorder, Congenital Cardiac Disorder, Seizure Disorder,
Executive Functioning Deficits and Cognitive Disorder, Auditory
Processing Disorder and Nonverbal Learning Disability.  Many, if
not all of these disorders are related to Nicholas' having
suffered a perinatal brain injury called Periventricular
Leukomalacia ("PVL").

Although he spent several years in the Norristown public
schools in the elementary and middle school grades, Nicholas'
parents unilaterally removed him from the Norristown public
school system following his fifth grade year at East Norriton

---

[1]  Although in his letter of May 5, 2015 requesting a special education
due process hearing, Plaintiffs' counsel claimed violations of the IDEA,
Section 504 and the "corresponding regulations of the Pennsylvania Public
School Code," the Hearing Officer's Decision addressed only the issue whether
the Norristown Area School District had violated the IDEA. Given that "[t]he
IDEA and §504 of the Rehabilitation Act do similar statutory work" and §504
has been said to be "parallel ... in its protection of disabled students [in
that] it protects the rights of disabled children by prohibiting
discrimination against students on the basis of disability, and it has child
find, evaluation, and FAPE requirements, like the IDEA," this Court finds no
error in the Hearing Officer's failure to independently analyze Plaintiffs'
claims to the extent that they rely on §504 in addition to the IDEA.  See
generally, P.P. ex rel. Michael P. v. West Chester Area School District, 585
F.3d 727, 735 (3d Cir. 2009).  Like the Hearing Officer's, our discussion
shall also focus on Plaintiffs' available rights and remedies under the IDEA,
with the understanding that this discussion shall apply with equal force to
their claims under §504 and the corresponding state statutes, which state
statutes the parties themselves have not specifically addressed.

Middle School and placed him at the Stratford Friends School in
Newtown Square, PA because he was experiencing severe anxiety
and, in their opinion, wasn't making any real academic progress
in the public schools.  Nicholas remained at Stratford Friends,
which has small class sizes and specializes in educating children
who are challenged by disabilities such as his and thus learn
differently, for the following three years - through grades 6, 7
and 8.

Stratford Friends School, however, only went through the 8th
grade and thus at the end of the 2013-2014 school year, Nicholas'
parents began searching for another school.  In the Spring of
2014, Nicholas' parents independently retained Dr. Mary Lazar,
Psy.D., the Director of the Neuropsychology Assessment Center at
Widener University to undertake a comprehensive
neuropsychological evaluation of their son.  Dr. Lazar's
evaluation took place over two days - on March 25 and April 1,
2014, during which she interviewed Nicholas and his parents,
reviewed educational records, questionnaires and rating scales
from his teachers, and administered a wide variety of
educational, psychological and behavioral tests.  Nicholas
demonstrated greater performance in the verbal domain and
weaknesses in the nonverbal/perceptual reasoning domain and with
functional communications skills.  He was found to have, *inter
alia*, "pronounced difficulty learning and encoding new visual

3

information as well as trouble retrieving this information from long-term memory." (Joint Exhibit "J" 10, p. 8). He was also found to have difficulty with spatial perception and perceptual organization, analyzing complex visual information, integrating visual knowledge while formulating a motor response and displayed low abilities to solve higher level problems in reading, writing and math.

In addition, Nicholas experienced considerable problems with inattention and impulse control during everyday functioning. His executive functioning skills - organizing, directing, managing, planning, sustaining effort to task completion and learning from experience were also weak. Mathematics posed the area of greatest academic weakness and Nicholas was found to have difficulty solving multi-step problems and conceptually understanding numerical and quantitative concepts. Finally, Nicholas met the criteria for Generalized Anxiety Disorder in that he very frequently worried about his health (almost to the point of obsession), as well as his performance and how he is perceived by others, and suffered from overall anxiety.

Based upon these findings, Dr. Lazar made a number of general recommendations including that Nicholas consult with his treating physician regarding the appropriateness of medication to address his significant problems with self-regulation and anxiety, and specific recommendations for Nicolas' future

4

educational treatment[2], the first being that Nicholas be placed

---

[2]   Dr. Lazar's other recommendations for Nicholas' education included:

- Teachers should clearly articulate goals of a task such that each step required to complete an activity should be explicitly stated.

- Providing Nicholas with a list of numbered instructions that he could have available at his desk.  Asking him to independently complete the first step and then have teacher evaluate his progress and thereafter asking him to complete increasing amounts of steps on his own before teacher review of progress.  He should be reminded to check his list to determine if he completed all of the steps listed prior to turning in the work.

- Teaching Nicholas to group information into meaningful "chunks" before attempting to learn new material.

- Presenting the most concrete material first and then incrementally introducing more abstract concepts.

- Verbally reviewing past material and then verbally discussing similarities, differences and connections with new material.

- Verbally discussing cause-and-effect relationships between sequential events.

- Providing Nicholas with either notes or an outline in advance of class so that he is able to listen while the teacher presents material or a copy of class notes to which he can refer later and while studying for tests.

- Frequent Class discussions

- Encouraging Nicholas to ask for help when confused or doesn't fully understand what is needed to complete an assignment.

- Development of a homework plan/strategy for better management of independent work.

- Extended time (50%) to take quizzes and tests to compensate for slowed processing speed and to offset anxiety and executive functioning weaknesses.

- Opportunity to take tests in separate room with few distractions.

- Opportunity to take additional breaks during class time to maintain attention.

- Math instruction that helps Nicholas to incrementally develop skills and strategies in a stepwise, progressive manner and that will allow for practice and repetition to permit the development of a better conceptual understanding of procedures and applications.

- Instruction that allows Nicholas to learn how to break tasks down into small, manageable steps and to prioritize tasks.

in a small, highly structured classroom with a low student to teacher ratio.  Dr. Lazar's report was provided to the School District prior to the start of the 2014-15 school year and in advance of the Individualized Education Program ("IEP") meeting which was eventually held on September 9, 2014.

Shortly after receiving Dr. Lazar's report, in May 2014 Nicholas' parents applied and enrolled him in the Woodlynde School in Strafford, PA for the following school year.  Like Stratford Friends, Woodlynde School is dedicated to the education of students like Nicholas who learn differently and offers smaller class sizes and built-in structures designed to accommodate its students' learning needs, many of whom have been diagnosed with the same or similar learning disabilities or conditions as Nicholas.  Unlike Stratford Friends, Woodlynde is a K-12 college-preparatory school.  Despite having enrolled Nicholas at Woodlynde in May, Mr. and Mrs. H. had purchased tuition insurance such that they could obtain a refund from Woodlynde if they opted to return him to the public school setting or chose another placement for their son.

After the IEP meeting in early September, the District submitted its proposed IEP and Notice of Recommended Educational Placement ("NOREP") to the parents on or about September 10,

---

    - Allowing additional time to double check work for errors.
(Joint Exhibit 10, pp. 13-16).

2014.  The Defendant District recommended that Nicholas repeat his 8th grade year at the East Norriton Middle School with various accommodations in both special education and general education classrooms.  The parents, however, rejected the IEP and the NOREP and commencing in the fall of 2014, Nicholas repeated his eighth grade year at the Woodlynde School.

Towards the conclusion of the 2014-15 school year, on May 7, 2015, the parents sought reimbursement for Nicholas' Woodlynde tuition and transportation for the preceding year by filing a Due Process Complaint with the District on the grounds that it failed to provide Nicholas with a Free Appropriate Public Education. Despite the complaint or perhaps in response to it, the District scheduled another IEP meeting for the upcoming (2015-16) school year on July 30, 2015.  Following that meeting, the District offered another IEP and NOREP to become effective on September 1, 2015 at Norristown Area High School.  Because the offering for Nicholas called for his placement in large regular classrooms for his non-academic subjects and special education classrooms for his core, academic courses at the 1600-1700-student Norristown High School, his parents again rejected the District's IEP and NOREP and Nicholas remained at Woodlynde for his 9th grade year. They again sought Due Process and requested refund of tuition and transportation for the 2015-16 school year.  A Special Education Hearing Officer held two days of hearings on the case on August

20 and October 19, 2015 and subsequently issued a Decision on
December 14, 2015 finding that the District had sufficiently
offered a FAPE in both of its proposals for the two school years
at issue and denying the parents' request for tuition and
transportation reimbursements.  The parents then timely appealed
to this Court.

### Standard of Review

In considering an appeal from a state administrative
decision under the IDEA, district courts are required to apply a
nontraditional standard of review, sometimes referred to as a
"modified de novo review." D.S. v. Bayonne Board of Education,
602 F.3d 553, 564 (3d Cir. 2010); Mary T. v. School District of
Philadelphia, 575 F.3d 235, 241 (3d Cir. 2009).  Under this
standard, the District Court must make its own findings by a
preponderance of the evidence while affording "due weight" to the
ALJ's determination.  Mary T., id,(quoting Shore Regional High
School Board of Education v. P.S., 381 F.3d 194, 199 (3d Cir.
2004)).  In so doing, the District Court "must accept the state
agency's credibility determinations unless the non-testimonial
extrinsic evidence in the record would justify a contrary
conclusion." D.K. v. Abington School District, 696 F.3d 233, 243
(3d Cir. 2014).  Factual findings from the administrative
proceedings are to be considered prima facie correct and if the
Court does not adhere to those findings, it must explain why.

<u>Id</u>.  The Court may not, however, substitute its own notions of sound educational policy for those of local school authorities. <u>Ridley School District v. M.R.</u>, 680 F.3d 260, 268 (3d Cir. 2012).

Further, "[t]he issue of whether an IEP is appropriate is a question of fact." <u>D.S. v. Bayonne</u>, <u>supra</u>, (quoting <u>S.H. v. State-Operated Sch. Dis. Of Newark</u>, 336 F.3d 260, 271 (3d Cir. 2003)).  "But a court should determine the appropriateness of an IEP as of the time it was made, and should use evidence acquired subsequently to the creation of an IEP only to evaluate the reasonableness of the school district's decisions at the time that they were made."  <u>Id</u>, at 564-565 (citing <u>Susan N. v. Wilson School Dist.</u>, 70 F.3d 751, 762 (3d Cir. 1995)).

## Discussion

The Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §1400, *et. seq.* was designed to overcome the pattern of disregard and neglect disabled children historically encountered in seeking access to public education.  <u>Schaffer ex rel. Schaffer v. Weast</u>, 546 U.S. 49, 63, 126 S. Ct. 528, 538, 163 L. Ed.2d 387 (2005).  Indeed, the Supreme Court has said that "Congress enacted the IDEA to ensure that all children with disabilities are provided a 'free appropriate public education which emphasizes special education and related services designed to meet their unique needs and to assure that the rights of such children and their parents or guardians are protected.'"  <u>Forest</u>

Grove School District v. T.A., 557 U.S. 230, 239, 129 S. Ct. 2484, 2491, 174 L. Ed.2d 168 (2009)(quoting School Committee Of Town of Burlington, Mass. v. Department of Education Of Massachusetts, 471 U.S. 359, 367, 105 S. Ct. 1996, 85 L. Ed.2d 385 (1985)).  A free appropriate public education (FAPE)[3] "consists of educational instruction specifically designed to meet the unique needs of the handicapped child supported by such services as are necessary to permit the child to benefit from the instruction." Ridley School District v. M.R., 680 F.3d at 268-269 (citing Board of Education v. Rowley, 458 U.S. 176, 188-189, 102 S. Ct. 3034, 73 L. Ed.2d 690 (1982)).  In addition to having to be specially designed to meet the unique needs of the child, the FAPE must be provided under public supervision and direction and at no cost to the parents.  P.P. ex rel. Michael P. v. West Chester Area School District, 585 F.3d 727, 738 (3d Cir. 2009).

School districts provide a FAPE by designing and administering a program of individualized instruction that is set

---

[3]   Under the statute, "[t]he term 'free appropriate public education' means special education and related services that -

(A) have been provided at public expense, under public supervision and direction, and without charge;

(B) meet the standards of the State educational agency;

(C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and

(D) are provided in conformity with the individualized education program required under section 614(d) [20 U.S.C. §1414(d)].

20 U.S.C. §1401(9).

forth in an Individualized Education Plan ("IEP"). <u>Mary T.</u>, 575
F.3d at 240.  The IEP has been characterized as the "centerpiece"
of the IDEA's "education delivery system for disabled children,"
with the premise that each would be designed by parents and
schools working together. <u>Honig v. Doe</u>, 484 U.S. 305, 311, 108
S. Ct. 592, 598, 98 L. Ed.2d 686 (1988); <u>M.R. v. Ridley School
District</u>, 744 F.3d 112, 117 (3d Cir. 2012).  "An IEP consists of
a specific statement of a student's present abilities, goals for
improvement of the student's abilities, services designed to meet
those goals, and a timetable for reaching the goals by way of the
services." <u>D.S.</u>, 602 F.3d at 557 (quoting <u>Holmes v. Millcreek
Twp. Sch. Dist.,</u> 205 F.3d 583, 589 (3d Cir. 2000) and 20 U.S.C.
§1401(a)(20)).

Finally, "[t]he IEP must be 'reasonably calculated' to
enable the child to receive 'meaningful educational benefits' in
light of the student's 'intellectual potential.'" <u>Id</u>, (quoting
<u>Shore Regional High School Board of Education v. P.S.</u>, 381 F.3d
194, 198 (3d Cir. 2004) and <u>Polk v. Cent. Susquehanna
Intermediate Unit 16</u>, 853 F.2d 171, 182-85 (3d Cir. 1988)).  A
"meaningful benefit" must entail "more than a trivial educational
benefit," but it does not have to maximize the child's potential.
<u>F.C</u>, 636 Fed. Appx. at 861 (quoting <u>L.E. v. Ramsey Bd. Of Educ.,</u>
435 F.3d 384, 390 (3d Cir. 2006) and <u>D.S. v. Bayonne</u>, 602 F.3d at
556).  Because an education is "specially designed" if the IEP is

11

made "in light of the student's intellectual potential," whether an education is "appropriate" depends upon the individual child's abilities and needs.  <u>Id</u>.(quoting <u>Chambers v. Philadelphia Board of Education</u>, 587 F.3d 176, 182 (3d Cir.  2009)).

If parents believe that an IEP fails to provide their child with a free and appropriate public education, they may challenge the IEP in an administrative proceeding.  <u>D.S.</u>, 602 F.3d at 557 (citing 20 U.S.C. §1415(b)(6)).  A parent who believes that a school has failed to provide a FAPE may request a hearing, commonly known as a due process hearing, to seek relief from the school district for its failure to provide a FAPE.  <u>Norristown Area School District v. F.C.</u>, 636 Fed. Appx. 857, 860, 2016 U.S. App. LEXIS 270 at *7, n.7 (3d Cir. Jan. 8, 2016); <u>Mary T.</u>, 575 F.3d 240 (citing 34 C.F.R. §300.507).  In Pennsylvania, which now follows a single-tier administrative process, all state-level review is provided by hearing officers who conduct the due process hearings.  <u>P.P.</u>, 585 F.3d at 734, n.2; <u>Carlisle Area Sch. v. Scott P.</u>, 62 F.3d 520, 527 (3d Cir. 1995).  The burden of proof at such hearings is on the party seeking relief.  <u>Schaffer v. Weast</u>, 546 U.S. 49, 62, 126 S. Ct. 528, 136 L. Ed.2d 387 (2005)).

A party to the due process hearing aggrieved by its outcome may then bring a civil action challenging the decision in any state court of competent jurisdiction or in a federal district

court, without regard to the amount in controversy.  <u>D.S.</u>, 602
F.3d at 558; 20 U.S.C. §1415(i)2).  In that event, a reviewing
"court's inquiry under §1415(e)(2) is twofold.  First, has the
State complied with the procedures set forth in the Act?  And
second, is the individualized education program developed through
the Act's procedures reasonably calculated to enable the child to
receive educational benefits?"  <u>Rowley</u>, 458 U.S. at 206-207, 102
S. Ct. at 3051.

 "Parents who believe that a public school is not providing a
FAPE may unilaterally remove their disabled child from that
school, place him or her in another school, and seek tuition
reimbursement for the cost of the alternate placement."  <u>Mary T.</u>,
575 F.3d at 242 (citing 20 U.S.C. §1412(a)(10)© and <u>Burlington
School Committee v. Dept. of Educ.</u>, 471 U.S. 359, 374, 105 S. Ct.
1996, 85 L. Ed.2d 385 (1985)).  "A court may grant tuition
reimbursement if the School District failed to provide the
required FAPE and the parents sought an appropriate private
placement."  <u>Id.</u>, (citing *inter alia*, <u>Lauren W., ex rel. Jean W.
v. DeFlaminis</u>, 480 F.3d 259, 276 (3d Cir. 2007)).  Indeed, the
Supreme Court has explicitly stated that "[p]arents 'are entitled
to reimbursement *only* if a federal court concludes both that the
public placement violated IDEA and the private school placement
was proper under the Act.'"  <u>Forest Grove</u>, 129 S. Ct. at 2496
(quoting <u>Florence County School Dist. Four v. Carter</u>, 510 U.S. 7,

15, 114 S. Ct. 361, 126 L. Ed.2d 284 (1993)).  "No reimbursement is required if the school offered a FAPE and the parents placed the child in a private school anyway." P.P., 585 F.3d at 739. And, "even where private placement is appropriate and reimbursement is otherwise due, the IDEA permits the equitable reduction or elimination of tuition reimbursement under certain circumstances." C.H. v. Cape Henlopen School District, 606 F.3d 59, 67 (3d Cir. 2010).  Such circumstances might be found to exist where the parents did not inform the District or the IEP team that they were rejecting the proposed placement, did not give the requisite 10 business days' notice that they were rejecting the placement prior to removal of the child from the public school or where the parents failed to make the child available for an evaluation.  See, e.g., 20 U.S.C. §1410(a)(10)(C)(iii).

In determining whether a private placement is proper, a disabled student is not required to demonstrate that he cannot be educated in a public setting.  Ridgewood Board of Education v. N.E. for M.E., 172 F.3d 238, 248 (3d Cir. 1999).  Nor must the parents of a disabled student seek out the perfect private placement in order to satisfy the IDEA.  Mary T., 575 F.3d at 242.  Indeed, a private placement is proper if it provides significant learning, confers meaningful benefit and is  provided in the least restrictive educational environment.  Id.;

14

Ridgewood, supra.  And a private school placement may be proper
and confer meaningful benefit even despite the private school's
failure to provide an IEP or meet state educational standards.
Mary T., supra, at 242 (citing, *inter alia*, Carter, 510 U.S. at
14-15 and DeFlaminis, 480 F.3d at 276).

In this case, the parents and the school district have filed
competing/cross-motions for judgment on the administrative record
such that each party contends that the record of testimony and
evidentiary materials submitted to the Hearing Officer justifies
the entry of judgment in their favor.  Stated otherwise,
Plaintiffs seek to overturn the finding of the Hearing Officer
that Norristown Area School District offered a FAPE to their son
whereas the District submits that the Hearing Officer's decision
is amply supported by the record.  According to the Plaintiffs,
the Hearing Officer erred in finding that the IEPs for the school
years at issue addressed Nicholas' needs as those needs were
identified in Dr. Lazar's Independent Educational Evaluation
("IEE") and in updated testing from Woodlynde.  Rather,
Plaintiffs assert, the IEPs for the 2014-15 and 2015-16 school
years disregarded Dr. Lazar's findings and recommendations for
Nicholas' placement and accommodations[4], most particularly that

_____

   [4]  Some 8-9 months prior to Dr. Lazar's evaluation, Nicholas had also,
at his parents' request, been evaluated by the District's chosen educational
psychologist (Dr. Riehs), Speech/Language Clinician (Dina Lunsford), and
Occupational Therapist (Kelly Wagner).  Noting "clinically significant
discrepancies... between Nicholas' cognitive ability and achievement in the
... areas [of] Math Problem Solving, Sentence Composition, Essay Composition,

Numerical Operations, Written Expression Composite, and Mathematics Composite," Dr. Riehs concluded that:

> Nicholas' diagnostic profile does indicate specific learning disabilities in the areas of Basic Math, Math reasoning, and Written Expression.  He continues to display executive functioning deficits with regards to impulsivity, inattention, and initiation skills.  Nicholas also demonstrates difficulties with regards to visual organization and visual sequencing. Clinical observations would concur with the presence of an Attention Deficit/Hyperactivity Disorder, Combined Type (Code 314.01) Nicholas did not endorse any symptomology (sic) related to anxiety and no clinical symptoms were observed.  Nicholas continues to demonstrate specific learning disabilities as his primary disability (Math, Written Expression) category with a secondary disability category of other health impairment,(history of ADHD, seizures, cardiac condition).  Nicholas continues to require specially designed instruction to access the general education curriculum.  This would include a highly structured environment that takes into account his executive functioning deficits and stresses remediation in the areas of mathematics and written expression.

(Parties' Joint Exhibit 3, p.6).

Based upon her evaluation, which took place in July 2013, Ms. Lunsford found that while Nicholas did not meet criteria for itinerant speech and language support services based upon her observations and the testing which she administered, she nevertheless "recommended that Nicholas receive the following accommodations to help support his social skills, peer interaction skills, ability to follow classroom directions, and engage effectively in classroom discussions:

> - utilize natural environment teaching to support social skills and social interactions with peers
>
> - implement social skills instruction
>
> - preferential seating to minimize environmental distractions
>
> - gain and keep his attention while attempting to communicate
>
> - limit the amount of directions given at once
>
> - have Nicholas repeat directions before starting
>
> - provide directions in written form as well as orally
>
> - demonstrate the task to be done to Nicholas
>
> - allow 'think' time for Nicholas before he responds to a question
>
> - prime or give him the questions first, before a passage is read orally

(Joint Exhibit 3, pp. 10-11).  Following the occupational therapy evaluation, Nicholas was found to have "displayed functional and appropriate skills in the areas assessed," such that he did "not currently qualify for Occupational Therapy service."

16

he be placed in a small, highly-structured classroom with a low student-to-teacher ratio.

At the outset, we observe that the District complied with all of the requisite procedures set forth in the applicable statutes and thus we find no procedural grounds to reverse the Hearing Officer's decision.  Next, in examining the IEPs offered by the District for the 2014-15 and 2015-16 school years, we find that both referenced Nicholas' history of congenital heart defect and perinatal brain injury which "manifests itself as a complex neurobehavioral disorder that includes seizures, attention problems, mood dysregulation, impulsivity and numerous cognitive and academic disabilities," and that he had diagnosed conditions including: Attention Deficit Hyperactivity Disorder, Central Auditory Processing Disorder, Developmental Coordination Disorder and generalized Anxiety Disorder.  The IEPs further noted that he had specific learning disabilities in the areas of math (problem solving and numerical operations) and written expression, and referenced Dr. Lazar's neuropsychological evaluation discussing a pattern of impairment in visual-spatial skills, motor coordination and executive function.  Also included in both IEPs was a review of Nicholas' various educational tests' scores (which ranged from borderline to average), performance on state and local assessments (which were all below basic), his grades at

(Joint Exhibit 3, p. 13)

17

the private schools, reports from his teachers, and the reported observations of two District representatives, Mrs. Helen Morein, the Acting Special Education Supervisor and Ms. Kate Jacovin, the Program Support Specialist from the Middle School.  Thus we find that the two IEPs included all of the necessary information called for by law.

The 2014-15 IEP contemplating Nicholas' return to the East Norriton Middle School for 8th grade included a number of accommodations for standardized state and local testing (*e.g.*, PSSA, Keystone exams) such as having the directions read and re-read to him, extended testing time, preferential seating, and testing in a separate room or small group and several measurable annual goals[5] to be measured through weekly probes, checklists or observational data with progress toward those goals being reported to the parents through the trimester report cards.

---

[5]   The measurable annual goals are described as follows: (1) "when given informational texts and a graphic organizer to organize new information on Nicholas' instructional level of 6th grade, Nicholas will identify and explain stated or implied main ideas with relevant supporting details with a minimum of 80% on 5 consecutive curriculum based assessments"; (2) "when given a writing probe, writing checklist and a graphic organizer, Nicholas will compose a three paragraph essay using appropriate transition within sentences and between paragraphs, establish a topic and purpose in the introduction, and reiterate the topic and purpose in the conclusion to score a 80% in 2 out of 3 consecutive writing probes across content areas"; (3) "when given a word problem that involves time and money, and presented with a learned strategy for solving word problems, Nicholas will set up and solve a one-step equation with 75% accuracy over 4 consecutive probes"; (4) "using a self-determination assessment and provided instruction on self-determination, Nicholas will increase his baseline score by 10 points by the end of the IEP year"; and (5) "in response to verbal prompts and modeling faded to the elimination, Nicholas will use a given graphic organizer to break down long-term assignments into single steps, estimate the time required to complete each step, and self monitor the step-by-step completion of the assignment within the time allotted in 4 out of 5 consecutive probes at each prompt level".  (Parties' Joint Exhibit ["J"} 14, pp. 33-36).

Presumably to achieve these annual goals, the following
modifications and specially designed instruction ("SDI") for the
classroom were offered in the 2014-15 IEP:

1.  "Direct instruction in assisting Nicholas with breaking
    down studying by night to develop study skills and assist
    with organization."  This was to take place in the special
    education classroom "as per testing situation."

2.  "Provide Nicholas with a list of numbered instruction
    and/or tasks to complete an assignment.  The list must be
    explicit.  Nicholas will be reminded to check off each item
    on the list and reviewed frequently by the teacher to ensure
    accuracy and completeness of task prior to submission."
    This was to take place in both special and general education
    classrooms "as per assignment."

3.  "Systematic strategy instruction in the area of math for
    completion required work problems - using a math frame."
    This was to take place in the general education classroom
    "as per assignment."

4.  Allow Nicholas to listen to class lectures and highlight
    keywords during note-taking activities.  Nicholas is a
    verbal learner and taking notes would detract from his
    ability to process new material."  This was also to take
    place in the special and general education classrooms "as
    per assignment."

5.  "Systematic strategy for written expression.  Using
    graphic organizer to assist with organization in writing to
    support the use of transition words and idea development
    between paragraphs."  This was to take place in both the
    special and general education classrooms "as per
    assignment."

6.  "Provide student with skeletal outlines, highlighting
    critical features and essential vocabulary for all content
    areas."  Likewise, this was to occur in both the special and
    general education classroom on an "on-going" basis.

7.  "Study guides will be provided for content area subjects
    at least 5 days prior to unit or chapter test.  Nicholas
    will use the study calendar to support him in preparation
    for test."  This was also to occur in both the special and
    general education classroom "as per testing situation."

19

8.  "Preferential seating" in the general education classroom "as needed."

9.  "All teachers will allow 'wait time' so Nicholas can organize his thoughts and respond to the question."  This was to occur in the general education classroom on an "on-going" basis.

10.  "Nicholas' teachers will make certain that he understands the assignment by asking him to repeat directions."  This was to take place in the general education classroom "as per assignment."

11.  "A sample for solving problems will be provided in math class."  This too was to occur in the general education classroom "as per assignment."

12.  "The teacher will read word problems in math when needed" in the general education classroom on an "as needed" basis.

13.  "Extended time for tests and/or quizzes not to exceed 100% of allotted time."  This was to be given in the special and general education classrooms "as per testing situation."

(Joint Exhibit J-14, pp. 36-38).   The IEP further explained the extent to which Nicholas would not participate with students without disabilities in regular education classes and in the general education curriculum by stating that he would participate with his non-disabled peers in the general education curriculum for all academic and related arts area (Physical Education, Art, Music and Computers).  He was to receive learning support on an itinerant basis for 20% or less of the school day.  (Joint Exhibit J-14, pp. 40-42).

The 2015-16 offered IEP also included a discussion regarding the "transition" goals of Nicholas and his parents at the conclusion of his high school years.  It appears that the intent

20

of that section of the IEP was to evaluate and address Nicholas'
areas of interest and strength so as to assist in planning for
his post-high school education and eventual career.  Both
Nicholas and his parents indicated that he is a very creative
young man who enjoys acting, singing, rock climbing and has
strengths in acting, singing, music and art and who expects to
continue to live at home after high school graduation and perhaps
attend a community college or university, although at this point,
Nicholas does not know what career he would like to pursue.  Both
Nicolas and his parents have concerns about his ability to plan,
manage money, communicate with others, organize and live
independently and Nicholas stated that he believe he has needs in
the areas of math, reading, organization, staying on task,
understanding what he is reading and understanding what is
expected of him.  The 2015-16 IEP offered all of the same
accommodations for standardized testing as the preceding years'
IEP, but added the use of a calculator for mathematics
standardized testing, reading test items at the student's
request, cuing Nicholas to stay on task, monitoring test
responses to ensure that he was correctly placing his responses
on answer sheets, use of a reading guide and highlighter, and
allowing him to read aloud to himself and write answers in test
booklets.

     The measurable annual goals set forth in the 2015-16 IEP

were identical to those established in the 2014-2015 IEP and were
to be measured through the same means and with the same
frequency.  His program modifications and specially designed
instruction, however, were different and more specific and under
this proposed program, Nicholas was to have special education
supports and services provided by special education personnel for
more than 20% but less than 80% of the school day.  The
modifications and SDI offered to commence in the Fall of 2015
were to be provided at Norristown Area High School[6] on a daily
basis and were as follows:

> 1.  Access to laptop for assignment completion.
>
> 2.  Special Education staff will provide support for math,
> social studies and/or science instruction/tests when
> student's reading or writing needs impact on his/her ability
> to be successful.
>
> 3.  Provide student with skeletal outlines, highlighting
> critical features and essential vocabulary for all content
> areas.
>
> 4.  Student's teachers will use Multi-Modality Instruction
> including modeling, explicit instruction, repetition,
> rephrasing, visual cues, graphic organizer, study guides,
> chunking of material, wait time and memory strategies in all
> Regular and Special Education classes
>
> 5.  Oral directions should be accompanied by written
> directions.
>
> 6.  Larger tasks broken down into smaller tasks.
>
> 7.  Allowance for short answers rather than writing long

---

[6]  Norristown Area High School was described in the Due Process Hearing
as a school with between 1600 and 1700 students in grades 9 - 12.  Of these,
there are approximately 365 students receiving special education services at
the high school.  (Joint Exhibit 5, pp. 427-428).

essays.

8.  Extra copy of textbook provided for the student to keep at home (unless online text book is available and student has internet access).

9.  Up to 1.5 times the normal test taking period.  Option of taking tests in a small group environment.

10.  Use of a calculator for basic math calculations, unless that is the focus of the assessment.

11.  Prompts to complete assignments.

12.  The student will be provided with opportunities and guidance to self-evaluate target skills.

In explaining the extent, if any to which Nicholas would not participate with students without disabilities in the regular education class and in the general education curriculum, the IEP stated: "Nicholas will not participate with his non-disabled peers for math, science, social studies and English.  He will participate with his non-disabled peers in the general education class for electives and lunch.  Nicholas will receive instruction in math, science, social studies and English in a learning support classroom," and "Nicholas will participate with his non-disabled peers in the general education curriculum." (Joint Exhibit 24, pp. 35-40).

Although we note that the IEP offered for the 2014-15 academic year clearly did incorporate some of the recommendations made in both the IEE and the report of the District's own evaluating psychologist and speech/language clinician, it did not appear to address this student's compelling need for a highly-

structured classroom environment, preferably with a low student-to-teacher ratio, nor did it articulate what supports or how the District intended to implement its specially designed instructions.[7]  No mention at all is made as to the articulation by teachers of goals and steps to be taken to accomplish those goals, "chunking" of information, verbal review of past information and discussion of its similarity to the new material being presented, allowing testing in a small room with frequent breaks in non-standardized testing situations, what mathematics program would be used to teach Nicholas or whether there would be any accommodations offered to him should he become overwhelmed by anxiety.  Indeed, the IEP speaks only in very broad and general terms as to what classroom accommodations and supports Nicholas could expect to receive upon his re-enrollment in the East Norriton Middle School for his 8th grade year.  Although the testimony elicited from a number of the District's witnesses at the Due Process Hearings provided some additional details as, for example, Karen Fairclough and Corrie Eisenhart testified that the District intended to use a co-teaching method in Nicholas' general education classrooms thereby somewhat reducing the

---

[7]  For example, it is unclear to this Court how the District proposed to teach Nicholas how to break down "studying by night to develop study skills and assist with organization," or how often he would receive such instruction(s).  The only detail provided is that such instruction would be given in a special education classroom.

student-to teacher ratio[8], that intention and those details are not reflected in the proposed IEP and thus as written, we cannot find that the proposed educational program provides anything other than a trivial educational benefit, much less a "meaningful" one to this student.

While the Hearing Officer here indicated that he was "not insensitive to the parent's arguments" "that the IEPs are vague and insufficient," and agreed that "the proper lens through which to view the IEPs" was the comparison of the April 2014 IEE with the IEPs proposed for the two school years in question, he nevertheless found that both were sufficient to provide FAPE.  We respectfully disagree and in so doing, acknowledge that we are required to give a certain amount of deference to the Hearing Officer's credibility determinations and factual findings.  Indeed, we are well aware that the factual findings from the administrative proceedings are to be considered *prima facie* correct and that if we fail to adhere to those findings, we must explain why.  D.K. v. Abington, 696 F.3d at 243.

We do so now by first observing that in our holding today,

_____

[8]  According to Karen Fairclough, the District's Supervisor of Special Education for the middle school level, in the middle school, a co-taught classroom would have an average of 15-20 students in it and a general education classroom upwards of 25 students.  (Joint Exhibit 6, pp. 201-203). Brigid Brady, the Special Education Supervisor for Norristown High School stated that there are approximately 15 students in each self-contained or special education classroom with one special education teacher and sometimes a paraprofessional.  For regular education classrooms, there are approximately 25 students in each with one teacher.  (Joint Exhibit 5, pp. 435-436).

we do not disturb the Findings of Fact made by the Hearing
Officer in his December 14, 2015 Decision.  However, given that
"a court should determine the appropriateness of an IEP as of the
time it was made, and should use evidence acquired subsequently
to the creation of an IEP only to evaluate the reasonableness of
the school district's decisions at the time that they were made"
[D.S. v. Bayonne, supra, at 564-565 (citing Susan N. v. Wilson
School Dist., 70 F.3d 751, 762 (3d Cir. 1995))], in looking at
the IEP as offered to Nicholas and his parents for the 2014-15
school year, we take issue with the Hearing Officer's application
of the relevant law to his factual findings and find this IEP to
be insufficient to provide FAPE to Nicholas for that year for the
reasons outlined above.

    Turning to the IEP for the 2015-16 school year, we agree
with the Hearing Officer's assessment that "[t]he SDIs and
modifications in the July 2015 IEP are broken down and phrased
somewhat differently than in the April 2014 IEP," and that the
two IEPs are similar in that "[t]he July 2015 SDIs and
modifications still call for notes and study guides and still
emphasize the Student's verbal learning style," and "the numbered
instructions called for in the April 2014 IEE are also carried
over."  (Exhibit 2, p. 7).  We find, however, that in re-phrasing
a number of the SDIs and proposed modifications, the District
provided much needed clarity for purposes of parental evaluation

26

of the sufficiency and appropriateness of the proposed supports prior to the Due Process Hearing.  And, in proposing a significant increase in the level of learning support in a smaller, more supportive and intensive classroom situation, we believe the District addressed Nicholas' social anxiety and his need for a highly structured learning environment with a lower student-to-teacher ratio.  Thus, in so altering the IEP for the 2015-16 school year, we find that the District did offer a FAPE to Nicholas.[9]

---

[9]    We have considered the parents' assertion, as raised in their briefing before this Court, that by placing Nicholas in a special education classroom for his core academic subjects, the District has violated its obligation to educate him in the "least restricted environment."  In H.L. v. Downingtown Area School District, Nos. 14-3678, 14-3727, 624 Fed. Appx. 64, 68, 2015 U.S. App. LEXIS 9472, *8- *10 (3d Cir. June 11, 2015), the Third Circuit cogently explained the general principles underlying this principle:

> The IDEA's LRE mandate provides that "[t]o the maximum extent appropriate," a child with disabilities is to be educated with non-disabled children, and "special classes, separate schooling, or other removal of the child from the regular education environment" should "occur only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." 20 U.S.C. §1412(a)(5)(A). In short, a student with disabilities must be placed "in the least restrictive environment that will provide the child with a meaningful educational benefit." (quoting D.S., 602 F.3d at 556-557).

> Whether a school district complied with the LRE requirement depends first on "whether education in the regular classroom, with the use of supplementary aids and services, can be achieved satisfactorily." Oberti v. Bd. of Educ. Of Borough of Clementon Sch. Dist., 995 F.2d 1204, 1215 (3d Cir. 1993).  This, in turn, is assessed by "the steps the school district has taken to accommodate the child in a regular classroom; (2) the child's ability to receive an educational benefit from regular education; and (3) the effect the disabled child's presence has on the regular classroom. L.E. v. Ramsey Bd. Of Educ., 435 F.3d 384, 390 (3d Cir. 2006). If education in the regular classroom cannot be achieved satisfactorily, we ask "whether the school has included the child in school programs with nondisabled children to the maximum extent appropriate."  Oberti, 995 F.2d at 1218.

> School districts must make available a "continuum of placements" to meet disabled children's needs, and, in seeking to accommodate the child in

As a consequence of our findings, we consider now whether Plaintiffs are entitled to tuition and transportation reimbursement for the 2014-15 school year.  To reiterate, under Supreme Court precedent, parents are entitled to reimbursement *only* if a federal court concludes both that the public placement violated IDEA *and* that the private school placement was proper under the Act.  <u>Forest Grove</u>, 129 S. Ct. at 2496 (quoting <u>Florence County School Dist. Four v. Carter</u>, 510 U.S. 7, 15, 114 S. Ct. 361, 126 L. Ed.2d 284 (1993)).  A private placement will be deemed proper if it provides significant learning, confers meaningful benefit and is  provided in the least restrictive

---

the regular classroom, they must "consider the whole range of supplemental aids and services, including resource rooms and itinerant instruction." <u>Id</u>., at 1216 (citations omitted); *see also,* 34 C.F.R. §300.115(a).  As we noted in <u>Oberti</u>, if a school "has given no serious consideration to including the child in a regular class with such supplementary aids and services and to modifying the regular curriculum to accommodate the child, then it has most likely violated" the LRE requirement.

In this case, it appears that in offering Nicholas the general curriculum delivered in four supplemental learning support classes in Math, Science, Social Studies and English with between 12 and 16 students, together with READ 180, a direct-instruction reading class, the District considered Nicholas' current levels of functioning and his deficits in Reading and Math and his need for a smaller and more self-contained classroom.  Under the District's proposal for the 2015-16 school year, Nicholas would be moving from classroom to classroom along with the general population of the school just as other students, but would be rotating for his core subjects from one supplemental learning classroom to another.  For his electives and lunch, he would participate in general education classrooms.  In this way, the District believed it could alleviate any stigma which might be attached to participating in a special education setting and address Nicholas' social anxiety.  (Exhibit J5, pp. 390-405).  It is noteworthy that the "IDEA requires that disabled students be educated in the least restrictive *appropriate* environment." <u>Ridgewood v. N.E.</u>, <u>supra</u>, 172 F.3d at 249(emphasis in original).  Hence, while the District's offer admittedly may not be perfect, we find that it was indeed reasonably calculated to enable Nicholas to receive meaningful educational benefits in the least restrictive setting possible in the high school.

educational environment.  Mary T., supra, 575 F.3d at 242.  And a private school placement may also be proper and confer meaningful benefit even despite the private school's failure to provide an IEP or meet state educational standards.  Id. (citing, inter alia, Carter, 510 U.S. at 14-15 and DeFlaminis, 480 F.3d at 276).

        In both the 2014-15 and the 2015-16 school years, Nicholas attended the Woodlynde School, located in Strafford, Pennsylvania.  As testified to by the Head of School at the Due Process Hearing, Woodlynde is a kindergarten through 12th grade independent school for students who learn differently, meaning that the school is focused on educating students with diagnosed learning disabilities, primarily dyslexia, dyscalculia, dysgraphia, auditory processing disorders, executive function disorders, ADD, and ADHD as well as a smaller number of students with high-functioning autism.  (Joint Exhibit 5, pp. 462-463). Woodlynde is accredited by the Pennsylvania Association of Independent Schools and licensed to operate as such; all teachers are required to be certified in the subject area in which they teach and many are dual certified in special education.  There are a total of 273 students enrolled at Woodlynde, it is a college-preparatory school which admits students with IQs in the average to above-average range.  The average class size is 9 students; Nicholas has classes which range from a low of 6 to a high of 14.  (J-5, pp. 464-465).

Woodlynde students have an 8-period day on a 6-day rotation.
The school day begins with a brief full-school assembly which is
followed by each student meeting for approximately 8 minutes with
their advisor.  The students then proceed through the eight-
period day with lunch in the middle.  Classes which meet daily
are math, English, social studies, science, and world language.
Every other day, the students also have a writing class and meta-
cognition, which is a class geared toward learning study skills,
organization and chunking skills, as well as mindfulness and
social skills.  Additional elective classes include studio art,
performance, and music. Class periods vary slightly but are
generally 43 minutes long.  Following the 8th period at the end
of the day, there is a 40-minute strategic planning period where
the students again check in and work one-on-one with their
advisors to make sure that they have correctly copied down their
homework assignments, understand what they need to do in
preparation for the next day, have the proper resources to do the
homework, etc.  At that point in the day, if the students missed
or didn't understand a concept or something important during
class or didn't write down or record an assignment, they go find
that teacher and can receive extra help or guidance.  (J-5, pp.
477-482).

Although Nicholas does not have an IEP at Woodlynde, the
school develops a learning profile for each student, which though

30

abbreviated, is similar to an IEP in that it includes a summary of the information from the psycho-educational reports, notates student strengths and weaknesses, and includes accommodations that have been found to be effective for each student.  (J-5, pp. 484-485).  The classroom and testing accommodations for each student are determined by a school team, which includes the Head of School, with the testing accommodations being provided regardless of whether the student or the individual teacher feel they are needed.  Classroom accommodations, on the other hand, are left up to the discretion of the classroom teacher to implement when necessary.  (J-5, pp. 517-519).  In reviewing Nicholas' report cards for his 8th grade year at Woodlynde, it appears that he made steady improvement in both his grades and in his classroom organization, participation, time management and study skills as well as with his social anxiety.  (Joint Exhibits J-5, pp. 490-493; J-6, pp. 50-52; J-23).  From this evidence, we easily find that the Woodlynde School has provided significant learning and confers a meaningful and beneficial education to Nicholas in the least restrictive educational environment. Woodlynde is therefore a proper placement for Nicholas and his parents are entitled to the reimbursement of their tuition and transportation costs for their son for the 2014-15 academic year.

## Conclusion

For all of the reasons set forth above, we shall grant in

31

part the Plaintiffs' Motion for Judgment on the Administrative Record in part and direct the Defendant School District to reimburse them for the tuition and transportation costs incurred in sending Nicholas to the Woodlynde School for the 2014-15 school year.  Plaintiffs' Motion is denied with regard to the 2015-16 school year.  Likewise, we shall partially grant the Defendant's Motion for Judgment on the Administrative Record with regard to the 2015-16 school year.  It is denied insofar as the 2014-15 school year is concerned.

An Order follows.